IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

DIANA C. STEINBERG,

       Plaintiff,

vs.

       CASE NO: 4:06-cv-58-SPM/WCS

TALLAHASSEE MEDICAL CENTER, INC.,
d/b/a CAPITAL REGIONAL MEDICAL
CENTER,

       Defendant.
_____/

**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

       This cause comes before the Court upon Defendant's Motion for Summary Judgment (doc. 32) and Plaintiff's response (doc. 48). The parties have had the opportunity to fully brief the issues and to submit materials in accordance with Northern District of Florida Local Rules 56 and 7.1.

       Plaintiff alleges in her complaint that she was subjected to a hostile work environment because of her race, in violation of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. ("Title VII"), and the Florida Civil Rights Act ("FCRA"), § 760.01 et seq., Fla. Stat.[1] Plaintiff claims that because Defendant was aware of

---

[1] Because federal case law regarding Title VII is applicable to claims under the FCRA, the same analysis will be used for Plaintiff's arguments under Title VII and the FCRA. Weaver v. Leon County Classroom Teachers Ass'n, 680

and failed to take appropriate action to correct the hostile work environment, she is entitled to damages. Defendant asks this Court to grant summary judgment in its favor because there is no genuine issue of material fact and Defendant is entitled to judgment as a matter of law.

**I. SUMMARY JUDGMENT STANDARD**

Federal Rule of Civil Procedure 56(c) provides that summary judgment will be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). An issue is "genuine" if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). An issue is "material" if it might affect the outcome of the case under the governing law. Id.

The burden is on the moving party to show that there is no genuine issue of material fact to be determined at trial. Mullins v. Crowell, 228 F.3d 1305, 1313 (11th Cir. 2000). The moving party may meet the burden by showing that the nonmoving party's case is fatally flawed due to a lack of evidence to support an essential element of the nonmoving party's case. Riley v. Newton, 94 F.3d 632, 638-39 (11th Cir. 1996). In determining whether the moving party's burden has been met, the court views the evidence and all factual inferences in the light most

---

So. 2d 478, 480 (Fla. 1st DCA 1996).

CASE NO: 4:06-cv-58-SPM/WCS

favorable to the nonmoving party and resolves all reasonable doubts about the facts in favor of the nonmoving party.  Burton v. City of Belle Glade, 178 F.3d 1175, 1187 (11th Cir. 1999).

If the moving party has satisfied its burden, the burden shifts to the nonmoving party who must show "that summary judgment would be inappropriate because there exists a material issue of fact."  Mullins, 228 F.3d at 1313.  The nonmoving party "must do more than show that there is some metaphysical doubt as to the material facts."  Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  If the evidence presented by the nonmoving party cannot sustain a genuine issue, summary judgment should be granted.  Anderson, 477 U.S. at 249.  The basic inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  Id. at 251.

## II. FACTS[2]

Plaintiff began working full-time for the Defendant in 1996 as a medical records processor in the incomplete records department.  In order to home school her children, Plaintiff changed her status and began working night shifts as a PRN[3] employee in 2000.  Plaintiff returned as a full-time employee again in

---

[2] The facts are presented in the light most favorable to the Plaintiff. Fitzpatrick v. City of Atlanta, 2 F.3d 112, 1115 (11th Cir. 1993).

[3] Plaintiff explained in her deposition that a PRN employee is an employee who works on an as-needed basis.

CASE NO: 4:06-cv-58-SPM/WCS

August of 2004.  She resigned on November 22, 2004.  Plaintiff, a Caucasian female, alleges that she was treated differently than the other employees in the incomplete records department when Carolyn Smith and Ms. Smith's effective supervisor, Angela Ward, both African American, became supervisors around the year 2000.

The problem started with uncompleted work from the day-shift being left for Plaintiff to complete during the night-shift.  Plaintiff noticed during her time working the night-shift that more and more medical record files were being left unshelved.  As a result, before Plaintiff could begin her work, she needed to put the files on the shelves.  Plaintiff, in hindsight, believes that this occurred because Ms. Smith allowed the day-shift workers, most of whom were African-American, to leave the files unshelved knowing that the Plaintiff, being white and unable to get away with as much, would have to put the files back on the shelves.

Beginning in 2002, Plaintiff talked to Ms. Smith numerous times about the work being left for her to complete and complained that Ms. Smith was not making the day-shift employees do their jobs.  Plaintiff also complained to Debra Weller, who is Caucasian and the director of the Medical Records Department, about Ms. Smith and the workload.  Despite speaking to Ms. Weller approximately three or four times during a nine month period about Ms. Smith, nothing was done to alleviate the problem.  Instead, in early 2003 Ms. Smith

gave Plaintiff a bad annual evaluation, which was corrected by Ms. Smith at Ms. Weller's direction.

Plaintiff later talked with Ms. Weller about returning to full-time status and working the day-shift.  Plaintiff explained that she was no longer home schooling her children and could therefore work during the day.  Plaintiff, however, expressed concerns to Ms. Weller about working full-time with the day-shift employees and directly under the supervision of Ms. Smith.  On occasion, Plaintiff had filled in on the day-shift and the employees seemed not to like her.  They did not talk to her and ignored her when she asked them questions.  Furthermore, Plaintiff thought that even though her working relationship with Ms. Smith was tolerable, Ms. Smith often criticized her work while not criticizing others' work.  Generally, Plaintiff thought that the working environment under Ms. Smith's management was unprofessional.

During the time that Plaintiff worked the night-shift on PRN status from the year 2000 to August of 2004, she sometimes worked with LeClois Bolar, an African American.  Plaintiff and LeClois Bolar had a strained working relationship, in part because Plaintiff called Ms. Weller to complain that Ms. Bolar had disrupted the work place by bringing an 18-month old child to work.

When Plaintiff changed to full-time status and began working the day-shift, her co-workers were LeClois Bolar, Hope Footman, Cathy Copeland, Stephanie Baxter, and Samantha Clark, who are African American, and Barbara Jones, who

is Caucasian. There were employees who at times may have worked in the same department, but neither Plaintiff nor Defendant has mentioned them as being involved in this case.

Plaintiff alleges that she was subjected to daily abuse from her African American co-workers and her supervisor, Ms. Smith. In general, they were rude, sabotaged Plaintiff's work, yelled at Plaintiff, and criticized Plaintiff unfairly. Specifically, Plaintiff alleges that Ms. Copeland and Ms. Footman ignored Plaintiff when Plaintiff would address questions to them. These two women would also cease conversations when Plaintiff came near because, Plaintiff presumes, they were talking about Plaintiff.

Plaintiff recalls that Ms. Smith criticized her daily about her performance and Plaintiff was often blamed for mistakes that other employees had made. Ms. Smith also required Plaintiff to reshelve all files that Plaintiff worked on, but did not require the other employees to do so. In September of 2004, Plaintiff told Ms. Smith that she no longer wished to work Sunday nights, but Ms. Smith refused her request.

Plaintiff recalls several times when Ms. Copeland and Ms. Footman made harsh comments about police officers knowing that Plaintiff's husband was a police officer. Plaintiff also recalls that her co-workers made harsh comments about "husbands" and how they would not want one, knowing that Plaintiff was married. Occasionally, Plaintiff's co-workers commented that Plaintiff sounded

like an old lady.

Plaintiff approached Ms. Weller in September of 2004 and told her of these comments to which Ms. Weller told Plaintiff to have thicker skin. Plaintiff responded that she felt it unfair to have to work in such an environment. Ms. Weller called a meeting with Ms. Ward and Plaintiff and told Plaintiff that they agreed that Ms. Smith was allowing the work environment to become unprofessional and inefficient and told Plaintiff that they intended to make big changes. At that meeting, Ms. Weller scheduled another meeting with Plaintiff on September 30th.

Ms. Weller, Ms. Ward, and Ms. Smith were suspended and subsequently dismissed (for reasons that have not been specified) the day before this meeting was to occur. Without a direct supervisor, Plaintiff asserts that the co-workers' harassment intensified. Plaintiff claims that her co-workers continued to ignore her and give her unfriendly looks. They also took her printed items off the printer and fax machine, thus requiring Plaintiff to search for the materials, stand guard by the fax machine and printer, or request that materials be resent.

Plaintiff claims that Mr. Leamon, a Caucasian who became the chief financial officer in September of 2004 and oversaw the medical records department after Ms. Weller was dismissed, witnessed this harassment. Subsequently, Plaintiff met with Melody Miller (race not specified), an employee in Defendant's human resources department, to discuss her concerns. She told

Ms. Miller that her co-workers were treating her poorly because of her age or her race or her marital status or all of the above.  Ms. Miller agreed to address these incidents with Mr. Leamon and Wendy Cimini, a Caucasian who served as the interim director from October 1 to 9, 2004, after Ms. Weller was terminated.

Mr. Leamon later appointed Carolyn Gravitt, who is Caucasian, as the new interim director.  According to Plaintiff, Ms. Gravitt was not effective in stopping the harassment.  On one occasion, Ms. Gravitt moved Plaintiff to another desk because Ms. Clark, an African American co-worker, demanded that she be moved.  Ms. Gravitt admitted to Plaintiff that she gave in to Ms. Clark because she thought Ms. Clark would continue to disrupt the work place otherwise.  Later that month, Plaintiff submitted her first letter of resignation to Ms. Miller.  On November 4, 2004, Plaintiff met separately with Mr. Leamon and Ms. Gravitt.  At both meetings, Mr. Leamon and Ms. Gravitt pleaded with Plaintiff to reconsider her resignation.  During those meetings, Plaintiff told both Mr. Leamon and Ms. Gravitt that she believed that her co-workers were treating her poorly because of her age or her race or her marital status or all of the above.  Mr. Leamon specifically told Plaintiff that he would appoint some stronger supervisors.  After these meetings, Plaintiff withdrew her resignation.

After withdrawing her resignation, her African American co-workers continued to harass her.  On one occasion Plaintiff claims that a co-worker told her to "get her white ass back where she belongs."  Plaintiff felt as though people

were making fun of her behind her back and making jokes about her. Plaintiff resigned on November 22, 2004.

Plaintiff supports her account of the facts with the affidavit of Ms. Jones, a Caucasian co-worker, who confirmed that Plaintiff was treated badly by co-workers but could not say whether the behavior toward Plaintiff was motivated by race.

### III. ANALYSIS

Title VII of the Civil Rights Act of 1964 makes it unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). A plaintiff suing under Title VII and FCRA for work place harassment carries the burden of proving that a hostile work environment exists. Edwards v. Wallace Cmty. Coll., 49 F.3d 1517, 1521 (11th Cir. 1995). The plaintiff must demonstrate the following elements: 1) she belongs to a protected group; 2) she has been subjected to unwelcome harassment; 3) the harassment was based on the protected characteristic; 4) the harassment was both subjectively and objectively severe or pervasive so as to alter the terms and conditions of employment and thus create a discriminatorily abusive work environment; and 5) the employer is responsible for the at environment under a theory of either direct or vicarious liability. Miller v. Kenworth of Dothan, Inc., 277 F.3d 1269, 1275 (11th Cir. 2002);

Mendoza v. Borden, Inc., 195 F.3d 1238, 1246 (11th Cir. 1999).

Assuming, *arguendo*, that Plaintiff has carried her burden on the other elements of her *prima facie* case, Plaintiff has not carried her burden on the third element to show that harassment was based on her protected characteristic, race. To succeed on a racially hostile work environment claim under Title VII and FCRA, Plaintiff must show that she was discriminated against because of her race. Austin v. City of Montgomery, No. 05-16737, 2006 WL 2219726, at *3 (11th Cir. Aug. 2, 2006) (unpublished).

In Austin the Eleventh Circuit found that a district court correctly granted summary judgment where the plaintiff failed to show that her treatment in the work place was as a result of her race. In that case, the plaintiff claimed that some of her job responsibilities were taken away, but presented little or no evidence which objectively showed that this treatment was because of race. Id. The plaintiff's subjective belief that her employer harassed her because of her race was insufficient to establish this element. Id.

In her deposition for this case, Plaintiff frequently said she could not figure out why her co-workers and her supervisor did not like her. She said that it could have been because of her martial status, her race, or her age. In describing her African-American co-workers, Plaintiff explained that they were "very young females primarily" (Plaintiff's Deposition at 22) and that:

[A]ll these people are like single mothers and they obviously hate

> men a lot of them from conversations I heard. They would complain about like–some of them lived in public-housing-type things, and they complained about, oh, you know, you wouldn't believe how much they make me pay and stuff. The fact that I was married and had a stable home life and we actually owned a house–I mean, you know, I guess that was something that might make some of them a little aggravated. . . . I guess they resented the fact that I was happily married and had a house and all that. . . . [N]o doubt they had difficult lives because they were single parents trying to raise kids and pay rent and all that. And lets face it, it's a lot easier if you have kids if you have a husband.

Id. at 29-30.

Plaintiff's deposition testimony revealed that there were frequent disagreements in the work place that did not involve Plaintiff and that were not related to race. Plaintiff explained that Ms. Footman "was the most incredible nasty person" and that "most of the people there didn't want to get into it with [Ms. Footman or Ms. Bolar] because you couldn't say anything to them." Id. at 126-27. Plaintiff also stated that "[Ms. Footman] was always getting into it with other people." Id. at 129. Plaintiff noted that her co-workers "talked behind each other's back." Id. at 128. Plaintiff recalled thinking to herself when Mr. Leamon asked them not to bicker, "These people don't care if you don't want them to bicker. They are going to bicker at whoever they want." Id. at 122. When asked whether the harassment toward Plaintiff was based on race, Plaintiff's Caucasian co-worker, Ms. Jones, acknowledged that "there were conflicts between various employees; but you know, not specifically black and white. So I don't know." Jones Deposition at p. 16.

CASE NO: 4:06-cv-58-SPM/WCS

Plaintiff explained in her deposition that some conflicts arose because her co-workers were far less diligent in their work than she. Plaintiff remarked that her supervisors allowed the department to have a party atmosphere and let people work without shoes and to laugh and to talk excessively on the phone. Plaintiff explained:

> [W]hen Carolyn was supervisor, she started letting these people get away with a lot more than they had ever been able to get away with; talking on the phone, taking as long as they wanted to for lunch, basically not doing as much work as they really should have.

Plaintiff's Deposition at 37.

> Well, it was like a party atmosphere. See, the way the department is, the front door you walk into. Then there's a record copy section in the very front of the department, but it's all open. So as soon as somebody comes in the front door–which, like I said, could be a doctor, could be a patient–they were laughing and carrying on. Just very unprofessional. And nothing was ever done about it.

Id. at 46. Plaintiff stated that her supervisor, Ms. Smith, "did nothing to maintain any kind of professionalism in the department . . . . [S]he was right in there with the rest of them." Id. at 47. In describing the situation, Plaintiff also explained that:

> Well, you know, they wanted to talk on the phone all the time and wear outfits that weren't very professional. When you work together, it sort of colors what other people are thinking of you, too, because they come in and see the whole department. So that's kind of an age thing. I realize that somebody that's 19 or 20 is going to dress differently, but when you are supposed to dress professionally, that should be professional, not that you wear these low-cut things with no sleeve all over here and that kind of thing that is just not appropriate no mater what age you are.

Id. at 163-64.  Plaintiff explained that her co-workers were:

> running around the department and not having their shoes on, you know, just making all kinds of noise, laughing hysterically.  I'm not talking about–laughing like you'd be in a circus or something.  Just very unprofessional.

Id. at 165.  Plaintiff perceived her co-workers' unprofessional behavior as "harassing to the extent that the doctors all thought we were a bunch of losers in there because of how certain people chose to dress."  Id. at 164.

Plaintiff states that she would either ignore her co-workers and continue to work or, on occasion, report her co-workers to Ms. Smith, Ms. Weller, or Mr. Leamon.  Plaintiff explains that she did not join in because it was unprofessional to do so and she was embarrassed by her co-workers' conduct.  Plaintiff recalls that she did not report on her co-workers more often because she didn't want management to view her as a troublemaker.

Given Plaintiff's own view of the work place and her doubts about why her co-workers treated her the way they did, no reasonable jury could draw a conclusion that Plaintiff's treatment was a result of her race.  Plaintiff's complaints about her supervisor and her co-workers describe conflicts of personality, work ethics, and management styles.  Although Plaintiff was of a different race than her co-workers, there are obvious reasons aside from race to explain the work place conflict.

Plaintiff's co-worker, Ms. Jones, witnessed the treatment directed toward

Plaintiff and was unable to state that it was because of race.  Plaintiff has pointed to only one specific instance out of eight years of working for Defendant in which a co-worker explicitly brought up her race.  Furthermore, in her deposition Plaintiff was not sure that any of the comments made to her or any treatment of her was related to race.  She frequently admitted that it could have been because she was older than her co-workers, or because she was married, or because she owned a house.  Given Plaintiff's own doubts and the lack of corroboration from any others involved, for a jury to make an inference that Plaintiff was harassed because of her race would be pure speculation.

The burden is on Plaintiff to show that she was harassed in the work place because of her race.  Plaintiff cannot carry her burden based on the evidence she has proffered.  Therefore, it is

**ORDERED AND ADJUDGED:**

1. Defendant's motion for summary judgment (doc. 32) is granted.

2. All pending motions are denied as moot.

3. The clerk shall enter judgment in favor of Defendant and against Plaintiff.

DONE AND ORDERED this 30th day of November, 2006.

                *s/ Stephan P. Mickle*
                Stephan P. Mickle
                United States District Judge